UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 19cr10149 |
| | ) | |
| v. | ) | Violations |
| | ) | |
| DREW MORGAN CICCARELLI, | ) | Count One: Conspiracy to Commit Securities Fraud and Money Laundering |
| Defendant | ) | |
| | ) | (18 U.S.C. § 371) |
| | ) | |
| | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INFORMATION

The United States Attorney charges that:

At all times relevant to this Information:

General Allegations

Key Individuals and Entities

1. The defendant, DREW MORGAN CICCARELLI ("CICCARELLI"), was a resident of Charleston, South Carolina. CICCARELLI owned several limited liability companies, including Five Star Consulting, LLC and TSX Ventures, LLC, through which he engaged in the paid promotion of publicly-traded companies and retained other stock promoters to promote publicly-traded companies. In addition, CICCARELLI was associated with or exercised control over other entities, including FlipVentures, LLC, that either promoted publicly-traded companies or retained third parties to promote publicly-traded companies.

2. Co-conspirator 1 ("CC-1") was a resident of British Columbia, Canada, and a former resident of Colorado, who engaged in pump-and-dump schemes.

3. Co-conspirator 2 ("CC-2") was a resident of South Carolina. CC-2 operated a company called Global Marketing Media LLC ("GMM") that promoted stocks as part of pump-and-dump schemes.

4. The United States Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government. The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations concerning the federal securities laws. Among other things, federal securities laws, regulations and rules are designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the fair price of stock. The rules and regulations promulgated by the SEC include provisions that require individuals to file public reports after acquiring direct or indirect ownership of more than five percent of a class of a company's registered securities, and that further require individuals who directly or indirectly control more than ten percent of a class of a company's registered securities or shares to file public reports after selling some or all of those shares.

5. Rarus Technologies (hereinafter, "Rarus" or "RARS") was a corporation registered in Nevada and based in Oceanside, New York. Until in or about April 2018, the securities of Rarus were registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act of 1934. The stock of Rarus was quoted under the ticker symbol "RARS" and traded on the over-the-counter ("OTC") markets. During the relevant period, Rarus was purportedly in the business of developing a social media platform.

### Key Terms and General Background on "Pump-and-Dump" Schemes

6.     "Penny" or "microcap" stocks are securities issued by small, publicly-traded companies that typically trade at less than $5 per share, and often less than $1 per share. Penny stocks are typically not listed on organized securities exchanges such as the New York Stock Exchange or NASDAQ Stock Market, but rather are traded on the OTC markets. Such stocks are particularly susceptible to manipulative trading and other forms of fraud because, among other things, they are often thinly traded and their free-trading shares may be controlled by a single individual or group of individuals (often referred to as a "control group").

7.     A "pump-and-dump" scheme typically involves the artificial inflation of the stock price and/or trading volume of a publicly-traded company (the "pump") so that the control group—often through third-party or "nominee" shareholders—can secretly sell their shares to other investors (the "dump").

8.     Generally, pump-and-dump schemes effect the artificial inflation of stock prices through, among other things, the issuance of news releases and promotional materials—often containing false, misleading, or exaggerated claims about the companies' potential, or predicting unrealistic stock price targets—and through manipulative trading designed to generate the appearance of demand for shares. Such schemes often rely on paid promotional campaigns to disseminate false and misleading information through emails, newsletters, hard mailers and social media outlets.

### The Conspiracy To Commit Securities Fraud and Money Laundering

9.     As set forth below, in or about and between at least 2010 and February 2016, both dates being approximate and inclusive, CICCARELLI conspired with CC-1, CC-2 and others

known and unknown to the United States Attorney to engage in a scheme to defraud, and to use manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, by employing paid promotional campaigns and manipulative trading techniques to artificially inflate the price and trading volume of numerous microcap stocks—including, but not limited to, Rarusstock—so that CC-1 and others could sell shares of those stocks at a substantial profit.

10. During the same time period, CICCARELLI conspired with CC-1, CC-2 and others known and unknown to the United States Attorney to conduct financial transactions designed to conceal and disguise the nature, location, source, ownership and control of the proceeds of securities fraud, including by using nominee entities within and outside the United States to disguise who was paying for promotional campaigns and how the proceeds of pump-and-dump schemes were distributed.

### Objects of the Conspiracy

11. A principal purpose and object of the conspiracy was to make money by artificially inflating the share price and trading volume of various publicly-traded companies and subsequently selling their shares.

12. Another purpose and object of the conspiracy was to transmit money among various nominee entities, and to third-party stock promoters, in order to conceal and disguise the ownership and control of the proceeds of pump-and-dump schemes.

### Manner and Means of the Conspiracy

13. Among the manner and means by which the defendant, CICCARELLI, CC-1, CC-2 and others known and unknown to the United States Attorney carried out the conspiracy were the following:

    a. Taking private companies public through reverse mergers into publicly-traded shell companies;

    b. Concealing their control of those publicly-traded companies by distributing their shares among nominee entities, individuals and accounts;

    c. Promoting and/or paying others to tout the stock of those publicly-traded companies, including through false, exaggerated or misleading press releases and other promotional materials, in order to generate demand for the shares and thereby to inflate the share price and/or trading volume;

    d. Paying for such promotions through nominee entities;

    e. Concealing their intention to sell the shares of those publicly-traded companies during the promotions;

    f. Concealing the transfer of proceeds from the sale of the publicly-traded companies' stock by transferring those proceeds through various nominee entities, individuals, and accounts, including bank accounts in the Cayman Islands in the names of purported law firms and other third-party entities, such as Bennington Law Firm, Cambridge Law Group, Crown Law Group and Legacy Global Markets, and bank accounts in the United States, including approximately $4.3 million that was transferred to entities controlled by CICCARELLI; and

g. Using the proceeds of pump-and-dump schemes to engage in additional waves of promotion and selling.

## Overt Acts

14. On or about various dates set forth below, CICCARELLI, CC-1, CC-2 and others known and unknown to the United States Attorney committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy.

15. On or about June 23, 2011, CC-1, together with others, caused the transfer of approximately 75 million shares of RARS to six nominee offshore entities, none of which individually held more than 5% of the company's total outstanding shares. Four of the six entities had registered addresses at Legacy Global Markets in Belize (hereinafter, "Legacy Global"); together, these four entities held 54 percent of Rarus's free-trading stock.

16. In or about and between August and September 2011, CC-1, together with others, caused all of the RARS shares held at Legacy Global to be deposited with the Depository Trust & Clearing Corporation ("DTCC"), which made the shares available for electronic transfer by broker-dealers transacting in the OTC market.

17. On or about May 22, 2012, CC-1 caused $350,000 to be wired from the Cambridge Law Group to FlipVentures.

18. On or about May 23, 2012, CICCARELLI, caused $100,000 to be transferred from FlipVentures to GMM.

19. On or before June 6, 2012, CICCARELLI caused FlipVentures to retain GMM to tout the shares of RARS as part of a paid promotional campaign.

6

20. On or about June 6, 2012, CC-2 began promoting RARS through GMM, prompting the stock's price and trading volume to increase. The promotions indicated that GMM expected to be compensated $200,000 by FlipVentures, but made no mention of CC-1.

21. On or about June 6 and June 7, 2012, Legacy Global, acting at the direction of CC-1 and others, sold shares of RARS, including to investors in the District of Massachusetts, generating proceeds of approximately $378,110.

22. On or about July 6, 2012, Legacy Global received a wire transfer of $4,670,000 into its bank account located in the Cayman Islands. These funds represented the proceeds of the sale of various securities, including the approximately $378,110 from the sale of RARS stock.

23. That same day, Legacy Global transferred this money to an account in the name of Cambridge Law Group, which, in turn, transferred $150,055 to the Cayman Islands' account of another entity, Bennington Law Group.

24. Also on or about July 6, 2012, CC-1, together with others, caused $150,000 to be wired from the Cayman Islands bank account of Bennington Law Group to a bank account in the United States in the name of FlipVentures.

25. On or about July 10, 2012, CICCARELLI caused $115,000 to be wired from the FlipVentures account to an account in the name of GMM.

## COUNT ONE
Conspiracy to Commit Securities Fraud and Money Laundering
(18 U.S.C. § 371)

26. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 25 of this Information as if fully set forth herein, and further charges that:

27. In or about and between at least 2010 and February 2016, both dates being approximate and inclusive, the defendant,

**DREW MORGAN CICCARELLI,**

conspired with CC-1, CC-2 and others known and unknown to the United States Attorney to commit offenses against the United States, specifically:

    a. securities fraud, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, by: (a) employing a device, scheme and artifice to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, specifically, shares of Rarus Technologies and other microcap companies, contrary to Title

15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5; and

b. money laundering, that is, to conduct and attempt to conduct financial transactions, knowing that the property involved in such transactions represented the proceeds of some form of unlawful activity, and which in fact involved the proceeds of specified unlawful activity, that is, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE ALLEGATION
## 18 U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c)

The United States Attorney further alleges that:

28. Upon conviction of the offense charged in violation of Title 18, United States Code, Section 371, as set forth in Count One of this Information, the defendant,

### DREW MORGAN CICCARELLI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) any property, real or personal, involved in such offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

    a. A forfeiture money judgment of $500,000, which is equal to the amount of proceeds the Defendant obtained as a result of the offense at Count One of this Information;

29. If any of the property described in Paragraph 28 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. have been transferred or sold to, or deposited with, a third party;

    c. have been placed beyond the jurisdiction of the Court;

    d. have been substantially diminished in value; or

    e. have been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 28 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

          Respectfully submitted,

          ANDREW E. LELLING
          United States Attorney

By: _____
          ERIC S. ROSEN
          STEPHEN E. FRANK
          Assistant U.S. Attorneys

Date: May 6, 2019